HENRY RUTZ v. TENNANT & HOYT COMPANY AND ANOTHER.[1]

March 23, 1934.

No. 29,721.

[1]Reported in 253 N. W. 665.

*Sweet, Johnson & Sands* and *Roy J. Brumfield,* for relators.
*Alfred A. Burkhardt* and *Kenneth R. Smith,* for respondent.

*HILTON, Justice.*

*Certiorari* to review an order of the industrial commission award-
ing compensation at the rate of $10.40 per week from and after
March 18, 1932, during disability, and for the payment of certain
expenses for medical and hospital care.

At about 11:00 a. m. on March 18, 1932, Henry Rutz (respondent)
was, with another employe, Carstens, engaged in loading a box car
with sacks of bran which were two and a half feet long and weighed
100 pounds each. As Rutz and Carstens, both in a stooped position,
were about to toss a sack of bran from the floor of a low truck onto
the top tier of piled sacks near the ceiling of the car, a distance
of eight and a half feet, a sack of bran rolled off the top tier, fell
clear a distance of about four feet, and struck Rutz on the back of
his head and neck. When the sack struck him he heard a crackling
noise in his spine and felt an electric shock pass on down to his
right foot. Carstens also heard the crackling noise. Rutz was
not knocked down or rendered unconscious; he could not, however,
start work at once and rested awhile, after which he resumed his
work and continued, with a few minutes off for lunch, until 3:00
p. m., the end of his shift.

About a half hour after the accident Rutz's right hip began to
stiffen, gradually growing worse, and he suffered pain. After
reaching his home the pain and soreness increased. At that time
all the pain was in the region of his lower back and hip. He re-
turned to work the next morning, but for only about an hour. He
then suffered great pain and after stooping over had difficulty in
straightening up. This condition increased and he became weaker
until he was unable to stoop over and lift the sacks. He reported
his injury to the foreman and was instructed by him to consult his

own family physician, Dr. Bowers, who examined him on March 19. The doctor found Rutz suffering with considerable pain and soreness in the lumbar and sacroiliac regions, and diagnosed the case as sacroiliac sprain with a trauma to the muscles of the back; he then had no pain in either of his legs. At that examination there was no apparent injury to the sciatic nerve of the right leg, but in a few days or a week considerable pain and soreness to that nerve developed and continued to increase until on April 3 he was taken to a hospital, where he remained five days. On April 30 he was returned to the hospital and there remained until May 12. From that time until the hearing he was incapacitated and continued to receive treatment from various physicians.

The assignments of error are that the commission erred in finding that as a result of the accident and injury the employe became disabled and continued to be so disabled and in awarding compensation and medical and hospital benefits; and in denying a motion of relators to dismiss the appeal of respondent to the industrial commission from an order of the referee, which order was adverse to respondent here.

■ It is conceded that the injury received by Rutz on March 18 arose out of and in the course of his employment. Relators, however, contend that the injury then received was trivial; that the medical testimony does not support a finding of causal connection between the accident and a resulting disability; that such disability was caused by infectious sciatic neuritis and not from trauma received at the time of the accident. The position of respondent is that his disabling ailment was a sacroiliac sprain with a resulting sciatic neuritis in the right leg, caused by the injury received on March 18, 1932.

The evidence discloses that when respondent was 14 or 15 years old, about 30 years before the accident, he had inflammatory rheumatism and was in bed four or five days and had not suffered from it since. About three years prior to the hearing he had a stiff shoulder, which he referred to as rheumatism. In April, 1931, his tonsils were removed after a first attack of tonsilitis; previous to that time he had a sore throat occasionally but not more often than

about once a year. He had a cleft palate. His upper teeth were poor and would not hold fillings; all but five of his upper teeth had been extracted and a plate put in; he had all his lower teeth; he never had trouble with the gums or had any treatment for pyorrhea. The evidence was in conflict as to whether there was pus in the gums.

Three physicians testified on behalf of relators, one of whom was a roentgenologist. The latter had not examined respondent, but from an examination of an X-ray picture of the sacroiliac and the history of the case gave an opinion favorable to the contention of relators. The other two physicians made an examination of respondent on July 5, 1932. They stated that they could not find pain or tenderness over the sacroiliac joint or evidence of a strain thereof, and diagnosed the case as sciatic neuritis of the right leg resulting from an infectious condition.

Three of the four physicians testifying for respondent, one of whom was an osteopathic physician, had examined respondent upon numerous occasions and prescribed treatment for several months. Some of such examinations were made before those made by relators' physicians and some after. The fourth physician examined respondent in August, 1932. The testimony of the physician witnesses for respondent was that there was pain, tenderness, and soreness in and around the sacroiliac joint and lower lumbar region; that there was a difference in the level of the posterior-superior spine. It was their opinion that respondent's ailment was of traumatic origin, and diagnosed it as traumatic sciatica of the right leg caused by a chronic strain of the sacroiliac, and, further, that the disability resulted from the injury received on March 18, 1932. Further reference need not be made to the lengthy and detailed statements made by the respective physicians as to what they found, their opinions therefrom, and the reasons therefor.

A neutral physician called by the referee examined respondent and made a report of his findings. His conclusions were:

"This man presents a clear-cut history of injury, followed by direct disability. He shows an atrophy of the musculature of the right leg, with all the signs and symptoms of a sciatic neuritis.

I have carefully searched for a focus of infection, and was unable to find anything to lead me to believe that a focus existed. I examined his teeth, his sinuses, his prostate, and his tonsils and appendix have been removed. The X-ray indicates that he has had an old sacroiliac arthritis on the right side, and it is my belief that when the sack of bran struck him it was transmitted to these joints, and this produced an aggravation of his preëxisting sacroiliac arthritis. It is a common finding to have a sciatic involvement where the sacroiliac joint is involved.

"I believe that this man is disabled as a result of this injury, and feel that with proper medical care he will be able to return within two or three months to productive work."

The conflicting medical findings and opinions presented to the commission the fact question as to whether respondent's admitted serious condition was the result of trauma received at the time of the accident or from an infectious condition. The evidence does not require reasonable minds to adopt a conclusion contrary to the one at which the commission arrived, and it cannot here be disturbed. 6 Dunnell, Minn. Dig. (2 ed. & Supp.) § 10426.

■ Relators contend that the industrial commission was without jurisdiction to hear the appeal to it from the findings of fact and disallowance of compensation of the referee for the reason that respondent failed to pay to the commission $10 as provided in § 4315, within the 20-day appeal period. That section reads:

"The appealing parties shall also pay to the industrial commission the sum of ten ($10.00) dollars to be applied on the cost of the transcript of the proceedings appealed from, or so much thereof as may be necessary to present the question raised on such appeal. The appellant shall also be liable for any excess of said ten ($10.00) dollars in the cost of said transcript and any part of said sum exceeding the actual cost of said transcript shall be refunded to said appellant; provided that the commission may on cause shown direct that a transcript be made without expense to the appellant."

Within the 20-day period respondent served the required notices of his appeal to the commission and also filed with the commission

a petition for a transcript without expense, under the above section. The petition was refused. Thereafter relators moved the commission for an order striking from the records and vacating the filing with it of the notice of appeal, or, in the alternative, for an order dismissing the appeal on the ground that the appeal had not been perfected because of the failure to pay the $10, or for an order dismissing the appeal unless the employe within 10 days from the entry of the order deposit with the commission the sum of $10. A few days before the hearing on that motion and about 60 days after the service of the notice of the filing of the decision of the referee, the $10 was paid to and accepted by the commission. The motion for dismissal was denied and the case heard by the commission.

The above quoted section does not expressly provide that the $10 must be paid within the 20-day appeal period. 2 Mason Minn. St. 1927, § 9492, relative to appeals from the district court to the supreme court, presents a different situation, for therein it is provided:

"To render the appeal effective for any purpose the party appealing shall, within the time provided by law for taking such appeal, file said notice together with the bond on appeal with the clerk of the lower court, and at the time of filing such notice and bond, such appellant shall deposit with the clerk the sum of $15."

The $10 referred to in § 4315 is not a filing fee; it is merely a deposit to be applied on the actual cost of the transcript. If the cost is less than that amount, the appealing party is entitled to a refund. The $10 requirement is directory rather than mandatory; the provision should be construed liberally within the manifest purpose and intent of the workmen's compensation act. It would be a narrow construction to say that the commission did not have jurisdiction and should have dismissed the appeal. See Frederickson v. Burns Lbr. Co. 163 Minn. 394, 204 N. W. 161; 6 Dunnell, Minn. Dig. (2 ed. & Supp.) §§ 10385, 8954.

The award is affirmed with an allowance of $100 to the employe-respondent for his attorney's fees in this court.

*DEVANEY, Chief Justice,* absent in attendance upon pardon board, took no part.